IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARCHWAY INSURANCE SERVICES, LLC | : | CIVIL ACTION |
| | : | NO. 09-2711 |
| v. | : | |
| | : | |
| JAMES RIVER INSURANCE COMPANY | : | |

O'NEILL, J.                                                    SEPTEMBER 21, 2010

MEMORANDUM

Plaintiff Archway Insurance Services, LLC filed suit against defendant James River Insurance Company, alleging claims of (1) breach of contract; (2) unjust enrichment; and (3) conversion. Presently before me are defendant's motion for summary judgment, plaintiff's response and defendant's reply. For the following reasons, I will grant in part and deny in part defendant's motion.

BACKGROUND

Defendant is an insurance company. Plaintiff is an insurance broker. The Ardsley Group, which is owned and operated by Stanley Segal,[1] manages facilities that provide care and services to the elderly. All Risks is an insurance broker that specializes in obtaining insurance for high-risk companies that experience difficulty obtaining insurance in the standard market. In this case, All Risks acted as defendant's agent.

On March 28, 2007, plaintiff, with the assistance of All Risks, brokered an insurance contract between Ardsley and defendant. In exchange for receiving $1,500,00.00 in insurance coverage from defendant, Ardsley was obligated to pay an annual premium totaling $257,350.00. The policy was numbered "15320-1" and was scheduled to expire on March 28, 2008. Policy

---

[1]    Plaintiff refers to Segal as "Siegal." I use Segal here because that is the spelling used on his deposition coversheet. See Def.'s Ex. B at 1.

number 15320-1 provided both professional liability coverage and general commercial liability coverage.

In order to pay the premium, Ardsley entered into a second agreement with plaintiff and Bank Direct Capital Finance LLC. Under the terms of this agreement, BankDirect loaned Ardsley $257,350.00 and Ardsley agreed to repay the loan in ten installment payments of $29,795.45.[2]

On April 16, 2007, Ardsley delegated the management of its nursing homes to Reliant Healthcare Management.[3] Reliant then contracted with New Courtland to manage the finances of the nursing homes. Reliant and New Courtland continued to make the installment payments owed to Bank Direct. At the end of February 2008, plaintiff was replaced by Oxford Coverage as Ardsley's broker on the policy. In March 2008, the parties agreed to renew the policy for one year. The renewal policy term was scheduled to begin on March 28, 2008 and to end on March 28, 2009. Defendant assigned number "15320-2" to the renewal policy.

On March 27, 2008 and again on May 8, 2008, Ardsley submitted claims under its insurance policy with defendant. The parties disagree over whether the claims were made under the original policy or under the renewal policy. Defendant asserts that both claims were made under the original policy. Plaintiff argues that the claims were brought under the renewal policy.

By letter dated March 16, 2009, Segal, on behalf of Ardsley, assigned to plaintiff the right to receive the unearned premiums under policy number 15320-1. Plaintiff asserts that policy

---

[2]     The installment payments account for accrued interest, taxes and fees.

[3]     It is unclear whether Segal maintained ownership of Ardsley and merely ceded adminstrative control or whether, as plaintiff appears at times to imply, Segal sold the company outright to Reliant.

number 15320-1 had been cancelled on October 12, 2007.  In support of its assertion, plaintiff

cites a pair of documents which, on their face, bear no obvious relationship to each other.  The

first is a fax transmission coversheet sent from Fred Milbert at Union One Insurance Group dated

October 12, 2007.  In the "To:" line of the coversheet, Milbert typed "Whom it may concern."

The fax was copied to All Risks.  The "Re:" line of the coversheet reads "Ardlsey – James River

– 00015320-1[.]"  The second document is an undated letter from Segal to Union One Insurance

Group.  The "Re:" line of the letter reads "Ardsley Group General and Professional Liability

Policy."  The text of letter states: "Sir: Please cancel my insurance policy immediately.  Thank

you[.]"

    This case turns on whether these two documents, in conjunction with the other evidence

proffered by the parties, establish that Ardsley cancelled policy number 15320-1.  Defendant

contends that based on the evidence in the record, no reasonable jury could conclude that the

policy had been cancelled.  Plaintiff, in response, argues that the evidence raises a genuine issue

of material fact appropriate for disposition by a jury.

## STANDARD OF REVIEW

    Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is

proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law."  An issue of material fact is genuine if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 255 (1986).  Summary judgment will be granted "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317,

322 (1986). The party moving for summary judgment has the burden of demonstrating that there

are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the

nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See

Anderson, 477 U.S. at 255.

When a properly supported motion for summary judgment is made, "an adverse party

may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse

party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party must

raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary

judgment motion and cannot survive by relying on unsupported assertions, conclusory

allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.

1989). However, the "existence of disputed issues of material fact should be ascertained by

resolving all inferences, doubts and issues of credibility against" the moving party. Ely v. Hall's

Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

Defendant argues that it is entitled to judgment as a matter of law for eight reasons.

Plaintiff wholly disagrees.[4] I will discuss each argument in turn.[5]

---

[4]    At the outset, I note that plaintiff's claim is premised on the allegation that
Ardsley assigned to plaintiff its rights under the contract. Plaintiff's rights under the contract are
therefore limited to those possessed by Ardsley under the insurance contract. See Smith v.
Cumberland Grp., Ltd., 687 A.2d 1167, 1172 (Pa. Super. Ct. 1997) ("an assignee's right against
the obligor is subject to all of the limitations of the assignor's right, to all defenses thereto, and to
all set-offs and counterclaims which would have been available against the assignor had there
been no assignment, provided that these defenses and set-offs are based on facts existing at the

I.     Plaintiff's Claims Are Not Time-Barred by the Contractual Suit Limitation Provision

Defendant first argues that plaintiff's claims are barred by the contractual time limitation on bringing suits under the policy. <u>See</u> Def.'s Br. at 11-13. The relevant provision states:

> 4.     Legal Action Against Us
>
> No one may bring a legal action against us under this policy unless:
>
> > A.     There has been full compliance with all of the terms of this policy; and
> >
> > B.     No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity [sic] the same be commenced within twelve (12) months next after discovery by the insured of the occurrence which gives rise to the claim, provided however, that if by any of the laws of the state within which this policy is issued each limitation is invalid, then any such claims shall be void unless such action, suit or proceeding be commenced within the shortest limit of time permitted by the laws of such state. We will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance.

Policy Number 15320-1, Common Policy Conditions at 1 (Def.'s Ex. C at JRIC-UW-1-00211).

Plaintiff argues that the time limitation does not apply to "non-claim related actions arising out of the policy." <u>See</u> Pl.'s Br. at 10 ("[Defendant's] assertion that [plaintiff's] claims are time barred is completely erroneous."). I agree with plaintiff.

The dispositive question is whether a claim for unearned premiums is a "claim under this

time of the assignment.").

⁵     Both parties apply Pennsylvania law. I will do the same.

5

policy" as specified in section 4(B).  Although this question appears to be an issue of first impression in this Circuit, other courts have answered it in the negative.  See P. & E. Finance Co. v. Globe & Republic Ins. Co., 239 P.2d 1009, 1011 (Okla. 1951); McCallum v. Nat'l Credit Ins. Co. 86 N.W. 892, 892-93 (Minn. 1901); see also 44A Am. Jur. 2d Insurance § 1910 (2010) (noting that a contractual time limitation within which a suit must be brought does not apply to "an action to recover unearned premiums upon the cancellation of a policy[.]"); 45 C.J.S. Insurance § 722 (2010) (same); C.T. Drechsler, Annotation, Limitations governing action to recover unearned premium retained by insurer upon cancellation of policy, 29 A.L.R. 2d 938 (1953) (same).

In P. & E. Finance Company v. Globe and Republic Insurance Company of America, 239 P.2d 1009, 1010 (Okla. 1952), the plaintiff bought automobile insurance from the defendant. The defendant then cancelled the insurance prior to its expiration date.  P. & E. Fin. Co., 239 P.2d at 1010.  Because the defendant refused to return the unearned premium, the plaintiff filed a lawsuit.  Id.  The defendant moved to dismiss the case on the ground that it had been brought outside the one year statute of limitations applicable to actions "for recovery of benefits under the policy."  Id. at 1011.  The trial court agreed and dismissed the case.  Id. at 1010.  The Supreme Court of Oklahoma reversed.  Id.  It held that "an action to recover unearned premium upon the cancellation of a policy of insurance is not an action for recovery of benefits under the policy. . . ."  Id. at 1011.

In McCallum v. National Credit Insurance Company, 86 N.W. 892, 892-93 (Minn. 1901), under slightly different circumstances, the court likewise distinguished between claims arising under the policy and claims for reimbursement of unearned premiums.  There, the defendant

insurance company became insolvent and the plaintiffs brought suit against the defendant to enforce liability against the stockholders of the insurance company. Id. at 892. The court divided the plaintiffs' claims into two categories: (1) "[t]hose arising from losses under the contract of insurance; [and] (2) claims for unearned premiums." Id. The court found the first category of claims to have been settled prior to the initiation of the litigation. Id. at 893. With respect to claims for unearned premiums, the court found inapplicable the contractual limitation on suits brought more than one year after the claim had accrued. Id. It reasoned that "[t]he claims for unearned premiums were not claims or liabilities under the contract of insurance." Id.

This case is analogous. I am persuaded by the distinction, set forth in both P. & E. Finance and McCallum, between claims for recovery of benefits under the policy and claims for unearned premiums. I likewise conclude that the contractual time limitation provision applies to the former but not to the latter. Accordingly, defendant's motion for summary judgment on this ground will be denied.

II.     Plaintiff May Not Pursue an Unjust Enrichment Claim Because an Express Written
        Contract Governs the Relationship Between the Parties

Defendant argues that it is entitled to summary judgment on plaintiff's claim for unjust enrichment because "[u]nder Pennsylvania law, a plaintiff cannot recover for unjust enrichment where an express contract governs the relationship between the parties." See Def.'s Br. at 13 (citing Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 506 (E.D. Pa. 2008)). I agree.

The Court of Appeals has clearly held that an equitable claim of unjust enrichment is unavailable where the relationship between the parties is founded on a written agreement. See Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987), citing

Murphy v. Haws & Burke, 344 A.2d 543, 546 (Pa. Super. Ct. 1985). In this case, the parties' relationship is governed by the insurance contract. Therefore, defendant's motion for summary judgment on the unjust enrichment claim will be granted.

Plaintiff's argument that Pennsylvania law allows a plaintiff to bring claims for unjust enrichment and breach of contract in the alternative does not compel me to alter my conclusion. See Pl.'s Br. at 11 (citing J.A. & W.A. Hess, Inc. v. Hazle Township, 350 A.2d 858 (Pa. 1976)). Although the Federal Rules of Civil Procedure allow a plaintiff to bring alternative claims, see Sheinman Provisions, Inc. v. Nat'l Deli, LLC, No. 08-453, 2008 WL 2758029, at *4 (E.D. Pa. July 15, 2008), "[c]ourts generally dismiss [unjust enrichment claims] when it is clear from the face of the complaint that there exists an express contract that controls." Lookout Windpower Holding Co., LLC v. Edison Mission Energy, — F. Supp. 2d —, No. 09-104, 2010 WL 1976883, at *4 (W.D. Pa. May 17, 2010) (internal citations omitted). Specifically, "where the validity and enforceability of a contract between the parties is not at issue, [unjust enrichment] may not be pled as an alternative theory of relief." Benchmark Grp., Inc. v. Penn Tanks Line, Inc., No. 07-2630, 2008 WL 2389463, at *5 (E.D. Pa. June 11, 2008). Here, there has been no allegation by either party that the contract for liability insurance is invalid or unenforceable. Therefore, defendant is entitled to summary judgment on plaintiff's unjust enrichment claim.

III.    Plaintiff's Conversion Claim Is Barred by Pennsylvania's Gist of the Action Doctrine

Defendant argues that plaintiff's conversion claim is barred by the "gist of the action" doctrine. See Def.'s Br. at 14-15. The gist of the action doctrine "operates to preclude a plaintiff

from re-casting ordinary breach of contract claims into tort claims."[6]  See Pittsburgh Const. Co.

v. Griffith, 834 A.2d 572, 581 (Pa. Super. Ct. 2003) (noting that "[C]ourts are cautious about

permitting tort recovery based on contractual breaches.").  "[A] claim should be limited to a

contract claim when the parties' obligations are defined by the terms of the contracts, and not by

the larger social policies embodied by the law of torts." Id. at 582 (quoting eToll, Inc. v.

Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002)).  "On the other hand, if the

contract is merely collateral to the wrong described, the existence of a contract does not prevent

recovery in tort."  Sarsfield v. Citimortgage, Inc., — F. Supp. 2d —, No. 09-00835, 2010 WL

1576461, at *4 (M.D. Pa. Apr. 20, 2010) (citing eToll, 811 A.2d at 14).  In order to distinguish

between claims sounding in tort and those sounding in contract, Pennsylvania Courts have held

that:

> The gist of the action principle bars tort claims under the following
> circumstances: (1) where the claim arises solely from a contract
> between the parties; (2) where the duties allegedly breached were
> created by a contract; (3) where liability is derived from a contract; or
> (4) where the success of the tort claim is dependent on the terms of a
> contract.

---

[6]      This Court has diversity jurisdiction over this case.  The substantive law of
Pennsylvania thus applies.  See State Auto Property & Cas. Ins. Co. v. Pro Design, P.C., 566
F.3d 86, 89 (3d Cir. 2009).  In the absence of Pennsylvania Supreme Court precedent on this
question, I must predict how that Court would rule.  See Berrier v. Simplicity Mfg., Inc., 563
F.3d 38, 45-46 (3d Cir. 2009).  In making that determination, "decisions of state intermediate
appellate courts should be accorded significant weight in the absence of an indication that the
highest state court would rule otherwise."  See Jewelcor, Inc. v. Karfunkel, 517 F.3d 672, 676 n.4
(3d Cir. 2008).
        Although the Pennsylvania Supreme Court has not expressly adopted the gist of the
action doctrine, both this Court and the Pennsylvania Superior Court regularly apply it.  See, e.g.,
Krajewski v. American Honda Fin. Corp., 557 F. Supp. 2d 596, 607 (E.D. Pa. 2008); eToll, Inc.,
811 A.2d 14.  Accordingly, I predict that the Pennsylvania Supreme Court will adopt the gist of
the action doctrine.

Kia v. Imaging Sci. Intern., Inc., No. 08-5611, 2010 WL 3322696, at *10 (E.D. Pa. Aug. 20, 2010) (citing Pittsburgh Const. Co., 834 A.2d at 582).

I find that the gist of the action doctrine bars plaintiff's conversion claim. Plaintiff's theory is that by refusing to refund the allegedly unearned premiums defendant has converted those funds. See Compl. ¶¶ 18-23. Whatever duty defendant had to return the allegedly unearned premiums, however, arose strictly from section 1(E) of the common policy conditions. See Policy Number 15320-1, Common Policy Conditions at 1 (Def.'s Ex. C at JRIC-UW-1-00211) (providing, inter alia, "[i]f this policy is cancelled, we will send the first Named Insured any premium refund due."). If there were no contract, defendant would owe no duty to plaintiff. Indeed, plaintiff implicitly recognizes this point in its complaint by citing the contract as the source of its rights that defendant had allegedly violated:

> 19. Defendant has converted funds to which Plaintiff is legally entitled under the insurance contract.
>
> 20. Specifically, upon cancellation, in keeping with the binding provisions of the insurance contract, Defendant was required to refund unearned premium. By refusing to return those funds to the Plaintiff, Defendant has converted funds and monies to which it has no legal entitlement, and has failed and refused to return these funds to Plaintiff.

Compl. ¶¶ 19-20. Because the contract is not collateral to plaintiff's claims, plaintiff's conversion claim is barred by the gist of the action doctrine. See Sarsfield, 2010 WL 1576461, at *4. I will therefore grant summary judgment in defendant's favor on the conversion claim.

IV.     Whether Plaintiff Waived Cancellation Is a Genuine Issue of Material Fact To Be Resolved at Trial

Defendant argues that even if plaintiff can ultimately establish that Ardsley or its agent cancelled the insurance policy plaintiff has waived any such cancellation. See Def.'s Br. at 16.

Defendant advances three arguments in support of this position: (1) Ardsley continued to make premium installment payments; (2) Ardsley renewed the policy in early 2008; and (3) Ardsley submitted claims under the policy on March 27, 2008 and May 8, 2008. See Def.'s Br. at 16-20. I will discuss each argument in turn.

A.     The Fact that Ardsley Made Premium Installment Payments Is Not Unequivocal Evidence of Waiver

Defendant first argues that plaintiff's claim that Ardsley cancelled policy number 15320-1 on October 12, 2007 is belied by the fact that Ardsley continued to make payments under that policy. See id. at 17-19. Plaintiff concedes that payments were made after October 12, 2007 but asserts that those payments were made to BankDirect pursuant to the financing agreement between Ardsley and BankDirect. See Pl.'s Br. at 13. According to plaintiff, such payments are not evidence of waiver because those payments would have been due even if policy number 15320-1 had been properly cancelled. See id.

Plaintiff's position is supported by the record. Emails between Ardsley and plaintiff concerning policy number 15320-1 refer to payments made to BankDirect. See Email from Donna Durso to David Geltzer (Nov. 7, 2007 2:28 PM) (Def.'s Ex. F) ("BankDirect Finance Agreement – GL/PL – This agreement is current – last payment was made on 11/6/07, with the next payment due on 11/28/07."). Additionally, Martin J. Sandos, an All Risks broker, testified that under a premium financing agreement the finance company pays the insurance company in full and the insured makes regular payments to the finance company. See Sandos Dep. 17:11 - 18:1 (noting that entering into a premium finance agreement for life insurance is "like buying a car"). If Ardsley only made payments to satisfy its financing agreement with BankDirect and not

to keep the insurance policy in force, such payments might not be evidence of waiver.

On the other hand, defendant argues that the only reason Ardsley continued to make payments to BankDirect was to prevent BankDirect from cancelling the insurance policy and collecting the unearned premiums.  See Def.'s Rep. at 7.  In support of this assertion, defendant cites the premium finance agreement, which assigns to BankDirect "any gross unearned premiums" as a security interest for the "total amount payable hereunder."  See Premium Finance Agreement at 2, ¶ 2 (Apr. 25, 2007) (Def.'s Ex. E).  If defendant's assertion that Ardsley continued to pay BankDirect in order to prevent the liability insurance from terminating is true, such payments might be evidence of a waiver of Segal's alleged cancellation.

Whether Ardsley's payments to BankDirect constituted a waiver depends on Ardsley's intent in making such payments.  Because reasonable people could disagree in answering this question, the evidence raises a genuine issue of material fact.  See Hanover Const. Co. to Use of Ede v. Fehr, 139 A.2d 656, 658 (Pa. 1958) (holding that the question of waiver is ordinarily a question of fact for the jury).  I will accordingly deny defendant's motion for summary judgment on this ground.

B.     The Fact That the Policy Was Renewed Is Not Unequivocal Evidence of Waiver

Defendant next argues that Ardsley's renewal of the policy is a waiver of "any claim that cancellation was intended or effected."  See Def.'s Br. at 19.  In response, plaintiff asserts that because the policy was renewed "by a different broker on behalf of a different operating company" the renewal does not constitute a waiver.  See Pl.'s Br. at 14.

The fact that Reliant Healthcare, and not Stanley Segal, renewed the policy in March 2008 is irrelevant to the question of whether the renewal constitutes a waiver.  Both Reliant and

Segal were acting as agents of Ardsley. Therefore, a policy renewal by Reliant would have exactly the same legal effect as a renewal by Segal.

The critical question, then, is what legal effect a renewal would have on the purported cancellation. Defendant argues that "[a] renewal is exactly what its name implies: a renewal of an existing policy." See Def.'s Rep. at 9. In other words, defendant asks me to infer that because the policy was characterized as a "renewal policy" the original policy had remained in effect through its March 2008 expiration date. Although defendant's proposed inference is logical, defendant bears the burden at this stage of presenting evidence to support the inference. See Celotex, 477 U.S. at 323. I have found no evidence in the record to establish that the fact that a policy is labeled a "renewal policy" means unequivocally that the original policy had not been cancelled before its expiration date. Because there remains a genuine issue of material fact as to whether Ardsley's renewal of its policy constituted a waiver of cancellation, I will deny defendant's motion for summary judgment on this ground.

C.      Ardsley's Submission of Claims Is Not Unequivocal Evidence of Waiver

Defendant asserts that Ardsley submitted claims under the original policy on March 27, 2008 and again on May 8, 2008. See Def.'s Br. at 20. It argues that by submitting such claims Ardsley waived any cancellation of the policy. See id. Plaintiff maintains that the claims at issue were submitted under the renewal policy, not under the original policy. See Pl.'s Br. at 14-15. Therefore, per plaintiff, such claims can not constitute a waiver of the cancellation of the original policy. See id.

The claim dated May 8, 2008 was clearly submitted under the renewal policy. See Def. Ex. J (identifying "Policy Nos. 00015320-2, 00015320-0"). The submission of that claim is

13

therefore insufficient, without more, to demonstrate as a matter of law that Ardsley waived any cancellation of the original policy.[7]

Unlike the May 8, 2008 claim, which clearly designated the applicable policy, it is unclear whether the March 27, 2008 claim was submitted under the original policy or under the renewal policy. Defendant points out that the term of the renewal policy did not begin until March 28, 2008. Accordingly, it concludes that a claim made on March 27, 2008 must have been submitted under the original policy. Two factors complicate defendant's otherwise reasonable inference. First, although the claim letter was dated March 27, 2008, it bears a date stamp of "MAR 28 AM 10:32." See Def.'s Ex. J. This is evidence that the claim letter was received by defendant on the first day of the renewal policy term. Additionally, the evidence indicates that the parties began negotiating the terms of the renewal policy as early as February 25, 2008. See Email from Maly Rottenberg, account executive, Oxford Coverage, Inc., to Marty Sandos, Broker, All Risks (Def.'s Ex. H). As a result, it is possible that Ardsley intended to submit that claim under the renewal policy.

In sum, I find that there is a genuine issue of material fact as to whether submission of the May 8, 2008 and March 27, 2008 claims constitutes a waiver by Ardsley of any cancellation. Defendant's motion for summary judgment on this ground will accordingly be denied.

V.    There Is a Genuine Issue of Material Fact as to Whether Defendant Received the Alleged Cancellation

Defendant next argues that it is entitled to summary judgment because there is no

---

[7]    I do not foreclose the possibility that Ardsley's submission of the May 8, 2008 claim is evidence of waiver. I merely conclude that, at this stage, such evidence is insufficient to support a finding of waiver as a matter of law.

evidence that defendant or its agents received the cancellation notice.  Plaintiff disagrees.

I find that there is sufficient evidence in the record from which a reasonable jury could conclude that the cancellation notice was received by defendant or its agent.  First, the cancellation notice signed by Segal was found alongside a fax cover sheet bearing the working fax number of All Risks, defendant's agent, in the desk of Fred Milbert, the Archway employee responsible for the maintenance of Ardsley's insurance.  The fax cover sheet includes the notation "TRANSMISSION OK."  <u>See</u> Def.'s Ex. M.  In addition to the physical proximity of the documents when they were discovered, each also references the insurance policy at issue in this lawsuit.  <u>See</u> Letter from Stanley Segal to unspecified recipient (Def.'s Ex. M) (referencing "Ardsley Group General and Professional Liability Policy); Fax Coversheet from Fred Milbert to All Risks (Def.'s Ex. M) (referencing Ardsley - James River - 00015320-1).  From this evidence a jury could reasonably infer that the coversheet and the cancellation were transmitted together to All Risks.  At minimum, this evidence raises a genuine issue of material fact appropriate for disposition by the jury.

VI.     Ardsley's Professional Liability Insurance Coverage Was Not Cancelled Because Ardsley
        Did Not Comply with the Applicable Statutory Notice Provision; However, There
        Remains a Genuine Issue of Material Fact as to Whether Ardsley's Commercial General
        Liability Insurance Coverage Was Cancelled

Defendant next argues that Pennylvania's Medical Care Availability and Reduction or Error Act ("MCARE"), 40 Pa. Stat. Ann. § 1303.747, renders ineffective Ardsley's alleged cancellation of its insurance coverage.  MCARE provides:

> A termination of a medical professional liability insurance policy by cancellation, except for suspension or revocation of the insured's license or for reason of nonpayment of premium, is not effective against the insured unless notice of cancellation was given within 60

15

days after the issuance of the policy to the insured, and no cancellation shall take effect unless a written notice stating the reasons for the cancellation and the date and time upon which the termination becomes effective has been received by the commissioner. Mailing of the notice to the commissioner at the commissioner's principal office address shall constitute notice to the commissioner.

40 Pa. Stat. Ann. § 1303.747. The statute defines "commissioner" as "[t]he Insurance Commissioner of the Commonwealth." See id. at § 1303.103.

It is undisputed that Ardsley did not notify the commissioner of its intent to cancel the insurance policy at issue here. Therefore, if the notice provision of section 1303.747 applies to Ardsley the purported termination was ineffective and the insurance policy remained in effect until the expiration of its term. Plaintiff argues that section 1303.747 is inapplicable to Ardsley for two reasons. First, it suggests that the insurance policy at issue was not a "medical professional liability insurance policy" as referenced in the statute. Second, it maintains that the statutory provision applies only to protect the insured against a termination of its policy by the insurer.

A.     The Insurance Policy at Issue Is Only Partially Subject to Section 1303.47

With respect to the first argument, I find that the insurance policy at issue is only partly a medical professional liability insurance policy under the terms of the statute. The statute defines medical professional liability insurance as "[i]nsurance against liability on the part of a health care provider[8] arising out of any tort or breach of contract causing injury or death resulting from the furnishing of medical services which were or should have been provided." 40 Pa. Stat. Ann.

---

[8]     The nursing homes owned by Ardsley qualify as health care providers. See 40 Pa. Stat. Ann. § 1303.103.

§ 1303.702. The insurance policy at issue covers both "professional liability" and "commerical general liability." The commercial general liability portion of the policy provides "[w]e [defendant] will pay those sums that the insured [Ardsley] becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies." <u>See</u> Policy Number 15320-1, Commercial General Liability Coverage Form at 1 (Def.'s Ex. C at JRIC-UW-1-00173) (internal quotation marks omitted). This portion of the policy clearly falls outside the statutory definition of medical professional liability insurance. Ardsley was therefore not obligated by section 1303.747 to notify the insurance commissioner before cancelling its commercial general liability coverage.

On the other hand, the portion of the policy providing professional liability coverage states that "[w]e [defendant] will pay . . . those sums the insured [Ardsley] becomes legally obligated to pay as damages because of professional services rendered . . . ." <u>See</u> Policy Number 15320-1, Professional Liability Policy at 1 (Def.'s Ex. C at JRIC-UW-1-00166) (internal quotation marks omitted). Professional services, in turn, are defined as "the furnishing of professional health care services by the Named Insured shown in the Declaration." <u>See</u> <u>id.</u> at 7 (Def.'s Ex. C at JRIC-UW-1-00171). The professional liability portion of the policy falls within the statutory definition of medical professional liability insurance and is subject to MCARE's notice provision.

B.    Section 1303.747 Applies To Cancellation of an Insurance Policy by the Insured

I must therefore address plaintiff's argument that the statutory provisions apply only to protect the insured against a termination of its policy by the insurer. In support of its position, plaintiff relies on the following statutory language: "[a] termination of a medical professional

17

liability insurance policy by cancellation . . . is not effective <u>against the insured</u> unless

notification was given within 60 days after the issuance of the policy to the insured[.]"  40 Pa.

Stat. Ann. § 1303.747 (emphasis added).  It argues that the phrase "against the insured" limits the

applicability of the notice provision to situations where the insurance company unilaterally

cancels an insurance policy.  <u>See</u> Pl.'s Br. at 18.  It thus maintains that Ardsley, as the insured,

was under no obligation to provide notice of cancellation.

　　　Plaintiff's argument is squarely foreclosed by <u>Green v. Juneja</u>, 487 A.2d 36, 38 (Pa.

Super. Ct. 1985).[9]  There, the plaintiff alleged that the defendant, a physician, had provided her

with negligent medical treatment in January and February of 1976.  <u>Green</u>, 487 A.2d at 37.  The

trial court granted summary judgment in the plaintiff's favor.  <u>Id.</u>  The question presented on

appeal was whether the defendant's medical malpractice insurance was in effect at the time of the

alleged malpractice despite the defendant's cancellation of such insurance.  <u>Id.</u>

　　　The Superior Court found that because the defendant had not complied with section

1303.747, his cancellation of the policy was ineffective.  <u>Id.</u> at 40.  In so doing, the court rejected

the argument that the notice provision applied only when the cancellation was effected by the

insurer.  <u>Id.</u> at 39.  It held that "[t]he language of [section 1303.747][10] is clear and unambiguous

that notice shall be given to the insurance commissioner upon <u>any termination</u> of a professional

---

[9]　　　I predict that the Pennsylvania Supreme Court would adopt the <u>Green</u> Court's
holding.  <u>See</u> <u>Berrier</u>, 563 F.3d at 45-46 ("In the absence of a controlling decision by the
Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict
how Pennsylvania's highest court would decide this case.").

[10]　　　The <u>Green</u> Court addressed this issue in the context of a prior version of section
1303.747.  The current version is substantively identical to the version considered by the <u>Green</u>
Court.  <u>See</u> <u>Green</u>, 487 A.2d at 39 (setting forth the statutory language).

liability policy." Id. (emphasis in original).  It also noted that such an interpretation was consistent with one of the purposes of the statute: "to benefit those persons who have sustained injury or death as a result of tort or breach of contract by a health care provider."  See id. (internal quotation marks omitted).  The court reasoned that if the defendant were allowed to cancel his insurance without notifying the insurance commissioner, individuals like the plaintiff might be left without recourse.  See id. (noting "[t]his purpose is upheld upon notice of cancellation effectuated by an insurer or by an insured.")

The Green Court's logic applies with equal force to the present case.[11]  First, like the Green Court, I find that the plain language of the statute clearly and unambiguously requires the insurance commissioner to be notified before the cancellation of any medical professional liability insurance policy, regardless of which party initiates the cancellation.  See id.; see also 40 Pa. Stat. Ann. § 1303.747.  Second, the statutory purpose discussed in Green–ensuring legal recourse for those individuals who have been injured by the tortious conduct of a health care provider–is equally relevant to this case.  If Ardsley were allowed to proceed unchecked in cancelling its medical professional liability insurance, the individuals residing in its nursing homes would be left without recourse in the event that they received negligent medical treatment. The statutory notice provision is designed to prevent such a situation.

C.      Conclusion - The Medical Professional Liability Component of the Insurance
         Policy Was Not Cancelled

In order to cancel its medical professional liability coverage, Ardsley was required by section 1303.747 to notify the insurance commissioner in writing.  Because there is no evidence

---

[11]      I note that plaintiff has not cited any case law to the contrary.

in the record that Ardsley provided such notice, I find as a matter of law that the medical

professional liability insurance coverage was not cancelled.  Accordingly, none of the premium

that Ardsley paid in consideration of the medical professional liability insurance policy was

unearned.  I will therefore grant Defendant's motion for summary judgment with respect to this

portion of the premium.

However, because the commercial general liability insurance coverage is not subject to

the provisions of section 1303.747, I find that there remains a genuine issue of material fact as to

whether Ardsley cancelled that coverage.  Defendant's motion will be denied with respect to the

premium paid in consideration of the commercial general liability insurance.[12]

VII.    Maximum Unearned Premiums

Finally, defendant argues that the maximum award to which plaintiff would be entitled

under the contract is $118,013.11.  It points to a policy provision that provides:

> ALL COVERAGE PARTS
>
> This endorsement sets forth the minimum earned premium for the
> policy.  The minimum earned premium for this policy is calculated in
> accordance with the following:
>
> 1.    The minimum premium for the policy period is the
>       total policy premium as shown on the policy
>       declarations page plus any premium adjustment by
>       endorsements and any additional premium developed
>       by audit
>       . . .
> 4.    If the insured cancels this policy and the policy is not
>       subject to audit, the return premium will be 90% of
>       the unearned policy premium; however in no event

---

[12]    The severance of the two components of the policy raises an additional question
of how much of the premium was paid in consideration of each component.  I will order the
parties to submit supplemental briefing on this issue.

> will the Company retain less than 25% of the
> minimum premium as described in paragraph 1.
> above.

Policy Number 15320-1, Minimum Policy Premium at 1 (Def.'s Ex. C at JRIC-UW-1-00210).  In response, plaintiff argues only that "[defendant] neglects to calculate any interest owed on the unearned premium as well as any other damages which can and should be awarded by this Court . . . ."  Pl.'s Br. at 18.

The appropriate measure of damages in a breach of contract case is that amount which puts the non-breaching party in the position he would have occupied had there been no breach.  See Hart v. Arnold, 884 A.2d 316, 338 (Pa. Super. Ct. 2005) (citing Birth Ctr. v. St. Paul Cos., Inc., 787 A.2d 376 (Pa. 2001); Harman v. Chambers, 57 A.2d 842 (Pa. 1948); Reformed Church of Ascension v. Theodore Hooven & Sons, Inc., 764 A.2d 1106 (Pa. Super. Ct. 2000)).  It would be premature, at this stage, to decide what damages plaintiff might recover.

CONCLUSION

In summary, defendant's motion for summary judgment will be granted in part and denied in part.  It will be granted with respect to plaintiff's claims for unjust enrichment and conversion.  For the reasons discussed more fully infra, defendant is entitled to summary judgment on both counts.  Defendant's motion will also be granted insofar as plaintiff seeks to recover the premium paid in consideration of the medical professional liability insurance.  Because I have found as a matter of law that such policy was not cancelled, defendant is entitled to summary judgment on that claim as well.

Defendant's motion will be denied in all other respects.

An appropriate Order follows.