IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARCHWAY INSURANCE SERVICES, LLC | : | CIVIL ACTION |
| | : | NO. 09-2711 |
| v. | : | |
| | : | |
| JAMES RIVER INSURANCE COMPANY | : | |

O'NEILL, J.                                                                                                                           DECEMBER 14, 2011

## MEMORANDUM

      Plaintiff Archway Insurance Services, LLC has sued defendant James River Insurance Company to recover unearned premium on an insurance policy that provided coverage for the Ashton Hall nursing home. Plaintiff was an insurance broker for the Ardsley Group, the company that ran Ashton Hall and entered into the policy with defendant. Plaintiff maintains that Ardsley canceled the policy before it expired, thereby obliging defendant to return unearned premium to Ardsley in accordance with the policy's terms. Plaintiff was assigned the right to any unearned premium and it now sues to enforce this right. Defendant responds by arguing that Ardsley never canceled the policy and that even if the policy were canceled Ardsley waived its right to any unearned premium.

      Plaintiff initially asserted claims of breach of contract, unjust enrichment and conversion. I granted summary judgment in favor of defendant on the unjust enrichment and conversion claims. The breach of contract claim proceeded to a non-jury trial. The parties then submitted post-trial briefs and I held a post-trial hearing to receive additional evidence from plaintiff. This memorandum sets forth my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the following reasons, I find that Ardsley canceled the policy but waived its right to any unearned premium. Accordingly, I will enter judgment in favor of

defendant and against plaintiff.

**FINDINGS OF FACT**

**I.     The Policy**

Plaintiff is a specialty insurance wholesaler that specializes in property and casualty coverage for large corporate risks. Mar. 7, 2011 Tr. at 112:6-8. Plaintiff served as an insurance broker for Ardsley, id. at 113:1-16, the company that owned Ashton Hall. Id. at 4:18-23. Ardsley hired plaintiff to procure professional liability and general liability insurance coverage for Ashton Hall. Id. at 113:1-16. Plaintiff lacked access to the markets for the coverage that Ardsley needed, so in March of 2007 plaintiff enlisted the services of All Risks, another wholesale insurance broker that could help find the right policy for Ardsley. Id. at 153:1-13. Plaintiff provided All Risks with information regarding Ardsley's insurance needs and All Risks in turn shopped for policies that fit those needs. Mar. 8, 2011 Tr. at 131:16-24. Defendant and other insurers offered terms to All Risks, who relayed the offer information to plaintiff. Id. Plaintiff then provided the various offers to Ardsley, who selected the James River policy. Id. at 132:1-3.

The evidence establishes that plaintiff and All Risks both understood that All Risks was working for plaintiff. Plaintiff's employee James Agnew explained that All Risks broker Martin Sandos "ha[d] always been active in trying to solicit our business." Mar. 7, 2011 Tr. at 153:1-2. Sandos referred to plaintiff as All Risks' "client." Mar. 8, 2011 Tr. at 134:15.

After Ardsley chose the policy, defendant issued a binder providing "a summary of the coverage(s) you have ordered." Def.'s Ex. 32 at p. 1. Toward the top of the binder, the document states, "Attention: Michele Redick." Id. Redick was Sandos's assistant. Mar. 8,

2011 Tr. at 8:5-8.  Immediately below, the binder states "Agency:  All Risks, Ltd. (King of Prussia)."  Def.'s Ex. 32 at p. 1  The binder also lists Ardsley as the "Applicant."  Id.  The rest of the binder outlines the terms of the policy.  Additionally, a document issued by defendant entitled, "Revised Quote" is addressed to the attention of Michele Redick and immediately below states "Agency:  All Risks, Ltd. (King of Prussia)."  Pl.'s Ex. 22 at p. 4.[1]

Plaintiff argues that the "Agency:  All Risks" language in the James River binder and the "Revised Quote" document establishes that All Risks was defendant's agent.  I disagree.  These documents merely state that they are addressed to Michele Redick, an employee at All Risks.

All Risks issued a "Confirmation of Insurance" document stating that "[w]e confirm that acting upon your instructions and for your account we have procured insurance."  Pl.'s Ex. 6 at p. 1.  The Confirmation of Insurance is addressed to plaintiff.  Mar. 8, 2011 Tr. at 133:24-25.  In addition to providing basic information about the terms of the policy, the Confirmation of Insurance states that "[t]his insurance may be cancelled by written notice by either the insured or the insurer(s) through us.  Notice of cancellation shall be deemed given by the insurer(s) when given by us to the insured or its representative."  Pl.'s Ex. 6 at p. 2.  The Confirmation of Insurance additionally states that "[t]his confirmation shall be automatically terminated and voided by delivery of the cover note, certificate of insurance or policy to the insured or its representative."  Id.

Defendant subsequently issued the policy, which includes a "Common Policy Conditions" section stating that Ardsley "may cancel this policy by mailing or delivering to

---

[1] Plaintiff's last trial exhibit is number twenty-one.  Plaintiffs offered additional documents as one exhibit during the hearing to receive Sandos's supplemental testimony.  I refer to this exhibit as exhibit twenty-two.

[James River] advance written notice of cancellation." Def.'s Ex. 3 at JRIC-UW-1-00211. This cancellation provision, however, is replaced by a "Pennsylvania Changes–Cancellation and Nonrenewal" endorsement. Id. at JRIC-UW-1-00229. The endorsement states in pertinent part that Ardsley "may cancel this policy by writing or giving notice of cancellation." Id.

Even though Sandos referred to plaintiff as All Risks' client, he testified that he believes All Risks lacked authority to cancel the policy. Nov. 1, 2011 Tr. at 10:10-11.[2] Moreover, All Risks never told plaintiff that a notice of cancellation would have been immediately effective upon receipt by All Risks. Id. at 10:23-11:2.

The "Common Policy Conditions" and the "Pennsylvania Changes–Cancellation and Nonrenewal" endorsement contain identical language regarding Ardsley's right to unearned premium in the event the policy is cancelled. Both sections state that "[i]f this policy is cancelled, [James River] will send [Ardsley] any premium refund due." Id. at JRIC-UW-1-00211 & JRIC-UW-1-00230.

## II. The Policy Premium and the Bank Direct Loan

The policy's premium was $257,100. Pl.'s Ex. 6 at p. 2. Sandos explained that payment for the policy's premium was sent to All Risks, who deducted its commission before forwarding

---

[2] After the parties filed post-trial briefs, I ordered them to submit additional briefs addressing whether All Risks acted as defendant's agent. I also invited the parties to notify the Court if they wished to present additional evidence on the agency issue. Plaintiff expressed its desire to present additional testimony from Sandos and on November 1, 2011 I held a hearing to receive his testimony and additional documentary evidence. Defendant has moved to preclude the reopening of the case for the purpose of hearing Sandos's testimony. See Dkt. No. 62. "Generally, whether a trial court will reopen a case to take more testimony is discretionary with that court." Rochez Bros, Inc. v. Rhoades, 527 F.2d 891, 894 n.6 (3d Cir. 1975). Both parties have an interest in ensuring that I decide the agency issue with all the relevant facts before me. Accordingly, I will deny defendant's motion and consider plaintiff's supplemental evidence.

payment to defendant.  Nov. 1, 2011 Tr. at 5:14-23.  An All Risks invoice for the policy directed remittance of payment to All Risks.  Pl.'s Ex. 22 at p. 3.

Ardsley financed the premium with a loan from Bank Direct.  Mar. 7, 2011 Tr. at 8:17-20.  The financing agreement called for ten monthly payments of $29,795.45 from Ardsley to Bank Direct beginning on April 28, 2007.  Def.'s Ex. 4 at p. 1.  The financing agreement empowered Bank Direct to cancel the policy in the event Ardsley failed to pay an installment.  Id. at p. 2.  It also stated that

> [t]he insured assigns to BANKDIRECT as security for payment of this Agreement, all sums payable to the insured with reference to the Policies listed above including . . . any gross return premiums and any payment on account of loss which results in reduction of unearned premium in accordance with the term(s) of said Policies.

Id. at p. 1.  Stanley Segal, the owner of Ardsley, signed the financing agreement on behalf of Ardsley.  Id.

### III.    Ardsley's Attempted Cancellation of the Policy

In April of 2007, shortly after Ardsley purchased the policy, Segal hired Reliant Healthcare to manage Ashton Hall.  Mar. 7, 2011 Tr. at 6:24-25.  A Management Agreement between Reliant and Ashton Hall appointed Reliant as the "managing agent" of the nursing home.  Def.'s Ex. 2 at RELIANT 03555.  The business relationship between Ardsley, Ashton Hall and Reliant soon soured, however.  Segal came to believe that Reliant was mismanaging Ashton Hall by, among other things, failing to pay the nursing home's vendors.  Mar. 7, 2011 Tr. at 16:12-16.  Segal responded by deciding to cancel the policy "and let Reliant get their own insurance and their own broker."  Id. at 16:15-16.  On October 11, 2007, Segal drafted a letter on Ardsley letterhead to plaintiff's sister company, Union One Insurance Group, stating:

>Re:  Ardsley Group General and Professional Liability Policy

>Sir:

>>Please cancel my insurance policy immediately.

Pl.'s Ex. 2 at p. 2.  Segal signed the letter.  Mar. 7, 2011 Tr. at 18:2-3.  He testified that he never intended Ashton Hall to go without insurance.  Id. at 73:25-74:6.  Rather, he hoped that Reliant would procure new insurance to replace the cancelled policy.  Id. at 74:8-11.  The agreement between Reliant and Ashton Hall expressly called for Reliant to "[o]btain and maintain insurance coverage, at [Ashton Hall's] expense," for the facility.  Def.'s Ex. 2 at RELIANT 03557.  There is no evidence, however, that Segal told anyone at Reliant that he decided to cancel the policy or that Reliant needed procure a replacement policy.

Segal could not recall exactly what he did with the letter, but he testified that he believed he gave it to Michael Yach, an Archway employee.  Mar. 7, 2011 Tr. at 18:9-14.  In Segal's mind Union One and plaintiff were "the same company, same people."  Id. at 41:4-5.  Yach, however, did not see Segal's cancellation notice until late February, 2008.  Mar. 8, 2011 Tr. at 16:20-22.  At any rate, Segal did not discuss his intent to cancel the policy with any of plaintiff's employees immediately after he prepared the cancellation letter.  Mar. 7, 2011 Tr. at 23:4-8.  Segal denied knowledge of whether monthly installment payments were made to Bank Direct after he wrote the cancellation letter.  Id. at 57:4-22.

Even though Segal could not remember what he did with the cancellation letter, plaintiff established that the letter was sent to All Risks.  Donna Durso, a former Union One employee who now works for plaintiff, faxed Segal's October 11, 2007 cancellation letter to All Risks on

October 12, 2007 at the direction of Fred Milbert, Union One's former managing member. Id. at 81:1-11. A Union One fax cover sheet, addressed to "Whom It May Concern" at All Risks, Pl.'s Ex. 2 at p. 1, accompanied Segal's letter. Mar. 7, 2011 Tr. at 80:10-81:11. The subject line on the fax cover sheet states "Ardsley – James River – 00015320-1." Pl.'s Ex. 2 at p. 1. Defendant's binder confirms that the policy number listed on the fax cover sheet is the correct number for the policy. See Def.'s Ex. 32 at p. 1. The fax cover sheet also includes a confirmation that the fax transmitted properly. Pl.'s Ex. 2 at p. 1. The fax number on the cover sheet matches All Risks' fax number. See id. & Mar. 8, 2011 Tr. at 153:15-18.

Sandos denied that All Risks ever received the faxed cancellation letter. Mar. 8, 2011 Tr. at 141:20-23. Despite Sandos's testimony, I find that Durso's testimony, the fax cover sheet from Union One and the cancellation letter from Segal establish that the notice of cancellation was sent to All Risks. Moreover, the fax cover sheet's listing of the policy number, combined with Segal's letter expressing his request to cancel his insurance policy, sufficiently put the recipient of the fax on notice that Segal wished to cancel the policy at issue in this case. There is no evidence, however, that defendant ever received a cancellation notice.

The fact that Durso sent the cancellation fax to All Risks and not to defendant appears consistent with the testimony of multiple witnesses who explained that communications between Ardsley and defendant would typically flow through plaintiff and All Risks. For example, Agnew was asked how a policy such as the one at issue in this case would be delivered from defendant to Ardsley. Agnew testified that defendant would send a policy to All Risks, who would then forward it to plaintiff, who would then give it to Ardsley. Mar. 7, 2011 Tr. at 123:23-124:2. Similarly, Sandos testified that if Ardsley wanted to cancel a policy, he would expect

Ardsley to send notice to plaintiff, who would then forward the notice to All Risks. Mar. 8, 2011 Tr. at 156:3-14. Moreover, James River employee Nicole Van Allen testified that a notice of cancellation for a policy such as the one at issue here would go from the insured to the insured's agent to All Risks to Defendant. Id. at 175:18-22. Van Allen also testified that defendant's brokers, not its insureds, typically sent defendant notices of cancellation. Id. at 175:9-15. Van Allen described All Risks as defendant's "broker" for this particular insurance contract. Id. at 175:15-17.

## IV. Ardsley's Post-Cancellation Conduct

In the weeks and months immediately following the transmission of the cancellation notice, no one at Ardsley did anything to ensure that the policy was in fact cancelled. Nate Niles, Reliant's Vice President of Finance at the time Reliant managed Ashton Hall, testified that he met with Segal around Thanksgiving in 2007 and discussed, among other things, the policy.[3] Id. at 83:13-84:5. According to Niles, Segal never mentioned his attempt to cancel the policy. Id. at 84:6-8. Instead, Niles and Segal discussed the need to continue paying for the Bank Direct loan for the policy premium. Id. at 84:14-17. Niles explained that the purpose of making the monthly installment payments to Bank Direct was "[t]o make sure that the policy stayed in effect." Id. at 90:5.

Between October, 2007 and January, 2008, Bank Direct sent Ardsley and plaintiff three

---

[3] At trial, plaintiff objected to the admission of Niles's testimony on the ground that defendant failed to disclose him as a witness. Mar. 8, 2011 Tr. at 69:11-21. Defendant, however, disclosed Niles as a witness in its pretrial memorandum filed January 6, 2011, three months before trial began. See Dkt. No. 49 at p. 8. Moreover, plaintiff cites to Niles's testimony in its post-trial brief. See Dkt. No. 58 at pp. 6-7. To the extent plaintiff continues to object to the admission of Niles's testimony, I overrule the objection.

notices of intent to cancel the policy for failure to make payments owed under the financing agreement.  See Def.'s Exs. 6, 8 & 12.  At no time did Segal point out to Bank Direct or anyone else that he had attempted to cancel the policy in October of 2007.  Instead, Niles testified that he worked with Segal to make sure that Bank Direct received payment.  For example, he met with Segal to discuss Bank Direct's December, 2007 notice of intent to cancel the policy and the two "found the money to pay it."  Mar. 8, 2011 Tr. at 92:12.  Niles also forwarded to Segal an email from Durso stating that the November, 2007 installment for the Bank Direct loan had not been paid.  Def.'s Ex. 14 at pp. 1-2.  The record includes no evidence that Segal responded by explaining that he had already attempted to cancel the policy.

On January 16, 2008, Segal terminated Ashton Hall's contract with Reliant and hired Fifty Jersey to manage Ashton Hall.  Mar. 7, 2011 Tr. at 22:23-23:3.  The record contains no evidence that Segal mentioned during this transition an attempt to cancel the policy or a need to replace the cancelled policy with a new one.

## V.     Renewal of the Policy

On February 25, 2008, Oxford Coverage, which replaced plaintiff as Ardsley's broker, contacted All Risks to obtain a quote from defendant for the renewal of the policy.[4]  Mar. 8, 2011 Tr. at 146:15-17.  At no point did anyone at Oxford Coverage tell All Risks that Segal had

---

[4]     Plaintiff objected to this testimony on the ground that Ardsley no longer owned Ashton Hall by the time the policy was renewed.  Mar. 8, 2011 Tr. at 147:15-16.  Segal, however, testified that Ardsley did not sell Ashton Hall until April 28, 2008, approximately two months after All Risks started working on the renewal of the policy.  Mar. 7, 2011 Tr. at 21:20.  Accordingly, I overrule the objection.

previously attempted to cancel the policy.  Id. at 148:1-5.[5]  Sandos explained that if a policy is cancelled, a new policy cannot be considered a "renewal."  Id. at 129:2-6.  Sandos further testified that the application to renew the policy did not "indicat[e] anything other than a continuation of insurance."  Id. at 148:25-149:1.  Ardsley ultimately renewed the policy, securing coverage from March 28, 2008 to March 28, 2009.  Def.'s Ex. 28 at JRIC-UW00222.

VI.   **Plaintiff's Post-Cancellation Conduct**

Plaintiff did not follow-up with All Risks on the attempted cancellation of the policy until late February, 2008.  Mar. 8, 2011 Tr. at 16:20-17:13.  Milbert's employment at Union One had just been terminated and Yach was reviewing Milbert's files when he discovered Segal's cancellation letter and the accompanying fax cover sheet.  Id. at 16:20-17:2.  Yach then contacted Sandos to see if All Risks could effectuate the cancellation.  Id. at 17:6-13.  By that time, however, Ardsley had replaced plaintiff with another broker.  Id. at 17:16-20.  Consequently, Sandos told Yach that All Risks could not ask defendant to return any unearned premium at plaintiff's request.  Id. at 160:7-19.

Even though plaintiff no longer served as Ardsley's broker, Yach worked to make sure that Bank Direct received the payments that Ardsley owed under the financing agreement.  On February 27, 2008, Yach wrote in an email to Fifty Jersey, Segal and Durso stating that Ardsley had fallen behind in its payments to Bank Direct and that "unless the account is made current by close of business tomorrow, the cancellation will remain in effect and there will be no coverage for Ardsley/Ashton should a loss occur."  Def.'s Ex. 17 at p. 1.  Yach also wrote that he had

---

[5]  Plaintiff made a relevance objection to this testimony.  I overrule the objection because the testimony is relevant to whether Ardsley waived its right to any unearned premium.

10

"spoken with Stanley [Segal] in this regard and need[ed] an answer today as to how the obligation to BankDirect will be met." Id. At trial, Yach denied having spoken to Segal about the need to pay Bank Direct and testified that the assertion to the contrary in his email was "probably a typo." Mar. 8, 2011 Tr. at 32:13-16. I deem Yach's contemporaneous email more reliable than his recollection at trial. Accordingly, I find that Yach did in fact discuss with Segal the need to pay Bank Direct so that Ashton Hall would not lose insurance coverage. The record contains no evidence that Segal responded to Yach's email by stating that he had attempted to cancel the policy.

## VII. The Bank Direct Guarantee

Archway employees Yach and Agnew each testified that Plaintiff had guaranteed payments to Bank Direct, but they gave inconsistent testimony as to the nature of the guarantee. Agnew testified that plaintiff guaranteed "the payment of any unearned return – unearned and/or return premium from the insurance company back to the finance company." Mar. 7, 2011 Tr. at 118:9-11. Yach, on the other hand, testified that plaintiff guaranteed payment to Bank Direct in the event Ardsley defaulted on its obligation to Bank Direct. Mar. 8, 2011 Tr. at 23:9-11. Regardless of the exact nature of plaintiff's guarantee, plaintiff paid Bank Direct approximately $158,000 to satisfy a guarantee. See Mar. 7, 2011 Tr. at 119:2-13; Mar. 8, 2011 Tr. at 25:6-14.

A document on Bank Direct letterhead entitled "Receipt and Assignment"[6] specifies that

---

[6] Defendant objects to the admission of the "Receipt and Assignment" document on the ground that plaintiff did not allege in the Complaint that it had a right to the unearned premium by virtue of an assignment from Bank Direct. Dkt. No. 56 at pp. 44-45. Defendant correctly notes that the complaint alleged only that Ardsley, not Bank Direct, assigned to plaintiff its right to the unearned premium. See Compl. at ¶ 1. Notably, however, defendant does not maintain that it has been surprised or prejudiced in any way by plaintiff's attempted use of the assignment from Bank Direct. Accordingly, I deem the Complaint amended to conform to the

plaintiff paid Bank Direct $158,715,74 "pursuant to the Guaranty extended to BankDirect by Archway and as a result of James River Insurance Company's failure to properly cancel the Ardsley . . . policy." Pl's Ex. 21. The document further states that it "evidence[s] BankDirect's assignment of its right, title and interest in the unearned premium relating to the Ardsley Policy, Number 00015320-1, issued by the James River Insurance Company." Id. Although the document does not specify that Bank Direct is assigning its interest in the unearned premium to Archway, Agnew and Yach both explained that plaintiff received the assignment from Bank Direct. See Mar. 7, 2011 Tr. at 142:4-10; Mar. 8, 2011 Tr. at 25:12-14. Moreover, defendant does not maintain that the "Receipt and Assignment" contains any ambiguity. Accordingly, I find that Bank Direct assigned its right to the unearned premium to plaintiff.

## CONCLUSIONS OF LAW

Plaintiff maintains that defendant breached its insurance contract with Ardsley by failing to return unearned premium upon Ardsley's cancellation of the policy. Ardsley assigned its right to any unearned premium from the policy to Bank Direct. Bank Direct, in turn, assigned its right to the unearned premium to plaintiff. Therefore, if defendant committed a breach, plaintiff would be entitled to the unearned premium.

---

evidence of the assignment from Bank Direct. See Fed. R. Civ. P. 15(b)(1) ("The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's . . . defense on the merits."). I also note that the Complaint alleges that plaintiff, not Ardsley, entered into an insurance contract with defendant. See Compl. at ¶ 14. The record contains no evidence of such a contract. But defendant has not objected to the admission of the insurance contract between Ardsley and defendant. Accordingly, the pleadings are amended to allege an insurance contract between Ardsley and defendant. See Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.").

**I.     Cancellation**

As a preliminary matter, whether defendant breached the insurance contract partly hinges on whether the policy was actually cancelled. The "Pennsylvania Changes – Cancellation and Nonrenewal" endorsement that I discussed above provides that Ardsley could have cancelled the policy "by writing or giving notice of cancellation." Def.'s Ex. 3 at JRIC-UW-1-00229. Although the endorsement does not specify that Ardsley give notice of cancellation to anyone in particular, the parties agree that a notice of cancellation must have been sent to defendant or its agent. I concur.

**A.     Failure to Deliver Cancellation**

Defendant maintains that plaintiff failed to prove that any cancellation notice was sent to anyone. I reject defendant's argument because, as I explained above, the fax cover sheet, Segal's cancellation letter and Durso's testimony establish that the notice of cancellation was in fact sent to All Risks.

**B.     Agency**

Defendant next argues that sending a cancellation notice to All Risks did not cancel the policy because All Risks was not defendant's agent.[7] To establish that the policy was cancelled, plaintiff must prove that All Risks, the only entity that received the notice of cancellation, was defendant's agent for that purpose. Under Pennsylvania law, which the parties agree applies to this case, "[t]he party asserting an agency relationship has the burden of proving it by a fair preponderance of the evidence." Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co., 602 A.2d

---

[7] In my summary judgment opinion of September 21, 2010, I stated without discussion that All Risks served as defendant's agent. Dkt. No. 40 at p. 1. In light of the facts adduced at trial and the parties' post-trial briefs, I will explain that finding.

1348, 1351 (Pa. Super. Ct. 1992). "The law is clear in Pennsylvania that the three basic elements of agency are: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." Basile v. H & R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000) (internal quotation marks omitted). A principal-agent relationship can exist if the agent has express authority, implied authority, apparent authority or authority by estoppel. See Volunteer Fire Co., 602 A.2d at 1352. Plaintiff argues that All Risks had apparent authority to act as defendant's agent. Apparent authority is that which "the principal has by words or conduct held the alleged agent out as having." Id. Defendant denies that any such principal-agent relationship existed. Therefore, plaintiff has the burden of establishing that defendant's words or conduct established that All Risks had apparent authority to receive notices of cancellation on its behalf.

Based on Van Allen's trial testimony, I find that defendant knowingly allowed notices of cancellation to be sent to All Risks. Van Allen testified that defendant ordinarily received notices of cancellation through its brokers, not directly from its insureds. Mar. 8, 2011 Tr. at 175:14-15. With respect to the policy at issue in this case, Van Allen identified All Risks as defendant's broker. Id. at 15-17. In the event that Ardsley wanted to cancel a policy such as the one at issue in this case, Van Allen would have expected a notice of cancellation to be sent through All Risks to defendant. Id. at 21-22. There is no evidence that defendant ever demanded that Ardsley or plaintiff send cancellation notices directly to defendant. Defendant's knowledge and acceptance that cancellation notices would travel through All Risks suffice to establish that All Risks had apparent authority to accept notices of cancellation on defendant's behalf.

The Pennsylvania Superior Court's decision in Joyner v. Harleysville Insurance Co., 574

A.2d 664 (Pa. Super. Ct. 1990), supports this finding. In that case, the Joyners paid the premium for their policy by sending payment to their broker, Seers. Id. at 666. The broker then forwarded payment to the Harleysville Insurance Company by issuing checks on the broker's account. Id. The following year, Harleysville accepted the Joyners' renewal request through Seers. Id. The Joyners attempted to pay for the premium by again submitting payments to Seers, but Seers failed to forward the payments to Harleysville. Id. The Court held "that Seers had apparent authority to receive premiums on behalf of Harleysville" such that the insured's payment to the broker sufficed to renew the policy. Id. at 667. The Court explained that

> Harleysville was aware of the role that Seers had adopted, and approved of Seers' course of dealing to the extent that Harleysville accepted Mr. Joyner's renewal request through Seers and accepted Mr. Joyner's premium payments in the form of the Seers checks, rather than insisting upon direct payment by the Joyners. . . . Harleysville knowingly permitted Seers to accept the premium payments and process Mr. Joyner's requests for changes in policy and renewal.

Id. at 669. Here, defendant knowingly permitted All Risks to accept notices of cancellation on its behalf. Defendant never insisted that Ardsley send a notice of cancellation directly to defendant. I therefore find that All Risks had apparent authority to accept notices of cancellation on defendant's behalf.

Defendant argues that Joyner is inapplicable because the Joyner Court expressly limited the scope of its holding to the broker's role as agent for the purpose of accepting payment of the premium, explaining that "the precise question presented here" was "whether the [broker] may be an agent of the insurer purely for the purposes of receiving and remitting premiums." Id. at 670. Even though this case concerns All Risks' role as agent for the purpose of receiving cancellation

15

notices, the underlying reasoning in Joyner is applicable.  If Harleysville's knowing acceptance of premium payments and renewal notices through Seers gave Seers apparent authority to receive premiums on behalf of Harleysville, then defendant's knowing acceptance of All Risks' role as the transmitter of cancellation notices establishes All Risks' apparent authority to receive notices of cancellation on defendant's behalf.

Defendant also argues that some evidence suggests that All Risks acted as the agent of plaintiff, not defendant.  For example, the All Risks Confirmation of Insurance is addressed to plaintiff and states, "[w]e confirm that acting upon your instructions and for your account we have procured insurance, subject to all of the terms and conditions hereinafter stated."  Pl.'s Ex. 6 at p. 1 (emphasis added).  This language strongly suggests that All Risks worked on behalf of plaintiff for the purpose of procuring insurance for Ardsley.  Agnew's and Sandos's testimony bolster the appearance that All Risks was plaintiff's agent for this purpose.  Agnew alluded to the fact that Sandos had actively solicited plaintiff's business, Mar. 7, 2011 Tr. at 153:1-2, and Sandos referred to plaintiff as All Risks' client.  Mar. 8, 2011 Tr. at 134:15.

The existence of a principal-agent relationship between plaintiff and All Risks does not, however, necessarily establish that All Risks was not also an agent of defendant, for a broker can serve as an agent for parties on both sides of an insurance transaction if the broker's duties to each party do not conflict with each other.  See Rossi v. Firemen's Ins. Co. of Newark, N.J., 165 A. 16, 18 (Pa. 1932) (explaining that an agent can serve two principals "where the duties of the agent to the two principals are of such nature that there can be no conflict between his duty of loyalty to the one and his duty of loyalty to the other").  I see no conflict between a duty of All Risks to help plaintiff procure insurance for Ardsley and a duty of All Risks to receive notices of

cancellation on behalf of defendant. Defendant, for its part, does not argue that any such conflict exists.

Finally, defendant argues that for All Risks' receipt of the notice of cancellation to have been effective, All Risks must have been "James River's agent for purposes of effecting an instantaneous and automatic cancellation" of the policy. Dkt. No. 56 at p. 26. But All Risks' apparent authority need not extend this far. In Joyner, where the broker received renewal premium payments, the question was not whether the broker had the authority to instantaneously and automatically renew the Joyners' policy. Rather, the issue was whether the broker had apparent authority to receive premium payments. Joyner, 574 A.2d at 671. Likewise, the pertinent question here is whether All Risks had apparent authority to accept notices of cancellation on defendant's behalf. I find that it did. Therefore, I find that the policy was cancelled.

## II.     Waiver of Right to Unearned Premium

Defendant next argues that even if the policy were canceled, Ardsley waived any right to unearned premium by continuing to make installment payments under its financing agreement with Bank Direct and by renewing the policy in 2008. "A waiver in law is the act of _intentionally_ relinquishing or abandoning some known right, claim or privilege. To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." Brown v. City of Pittsburgh, 186 A.2d 399, 401 (Pa. 1962) (citations omitted) (emphasis in original). "Waiver is essentially a matter of intention." Id. A waiver may be express or implied. Id.

I agree with defendant that Ardsley waived its right to the unearned premium. First, when

Bank Direct did not receive its monthly installment payments on time, Segal worked with Reliant to make sure that Bank Direct received its money so that the policy would remain in effect. Significantly, when Bank Direct did not receive timely payment, its notices did not merely state that premium payments were delinquent. Rather, Bank Direct threatened to cancel the policy altogether if it did not receive installment payments. The evidence establishes that Segal, Ardsley's owner, was aware of Bank Direct's threats to cancel the policy for nonpayment. Segal collaborated with Reliant to make sure that Bank Direct received payment. Even though Ardsley had an independent contractual obligation to pay Bank Direct under the financing agreement, Niles' testimony and the documentary evidence of communications to Segal concerning the need to pay Bank Direct persuade me that Segal intended to keep the policy in effect so that Ashton Hall would not go without coverage.

      Second, Ardsley's decision to renew the policy is additional evidence that Ardsley waived its right to unearned premium. Contrary to plaintiff's assertion, Ardsley still owned Ashton Hall when the policy was renewed. Sandos's testimony establishes that the policy could not have been renewed had it been previously cancelled. Ardsley's decision to renew the policy unequivocally shows that Ardsley abandoned its prior cancellation request.

      "[A] waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to." Brown, 186 A.2d at 401 (footnote and internal quotation mark omitted) (emphasis in original). Ardsley's conduct prejudiced defendant by keeping defendant oblivious to its obligation to return an unearned premium. Accordingly, I find that Ardsley impliedly waived its right to unearned

premium. It follows that defendant did not breach its contract with Ardsley by failing to return the unearned premium.

An appropriate Order follows.